1        HONORABLE RONALD B. LEIGHTON

2

3

4

5

6
                    UNITED STATES DISTRICT COURT
7               WESTERN DISTRICT OF WASHINGTON
                             AT TACOMA
8

   WILDERNESS WATCH, INC.,                    CASE NO. C15-5771-RBL
9
                         Plaintiff,           ORDER ON CROSS-MOTIONS FOR
10                                            SUMMARY JUDGMENT
             v.
11                                            DKT. ##21, 42

12   SARAH CREACHBAUM, in her official
     capacity as the Superintendent of the
     Olympic National Park; and the
13   NATIONAL Park Service,

14                       Defendants,

15   NATIONAL TRUST FOR HISTORIC
     PRESERVATION, et al.,
16
                  Intervenor-Defendants.
17

18        THIS MATTER is before the Court on Plaintiff Wilderness Watch's [Dkt. #21] and

19   Defendants Creachbaum and National Park Services' [Dkt. #42] Cross-Motions for Summary

20   Judgment. Intervenor-Defendants National Trust for Historic Preservation, Washington Trust for

21   Historic Preservation, and Friends of Olympic National Park [Dkt. #43] also submitted briefing.

22   Olympic National Park encompasses nearly one million acres of diverse landscape, protecting a

23   vast wilderness and years of human history. Within its 876,669 acres of wilderness, it houses 40

24

1   historic structures. Since 2011, the Park Service has repaired five structures. The parties ask the

2   Court to review the Park Service's decisionmaking record to assess whether it arbitrarily and

3   capriciously repaired these structures under the Administrative Procedure Act, 5 U.S.C. §§ 701–

4   06.

5        This case has implications greater than a record review typically suggests, however, as it

6   will influence the Park Service's management of wilderness areas. The Park Service has a

7   longstanding policy of preserving historic structures in wilderness. Wilderness Watch claims the

8   Park Services' "plan to perpetuate the existence of numerous man-made structures within the

9   Olympic Wilderness" violates the Wilderness Act, 16 U.S.C. §§ 1131–36. Dkt. #21 at 10. It

10  argues the Act prohibits the Park Service from preventing structures' natural deterioration.

11  National Trust claims Wilderness Watch promotes a dogmatic and restrictive interpretation of

12  the Act because it wants to eradicate Olympic National Park's cultural heritage. The Park

13  Service assumes a position between these two extremes and defends its maintenance work,

14  arguing the Act allows it to maintain "historically used" structures so long as the preservation

15  work is the minimum necessary.

16       Wilderness Watch argues the Park Service failed to make this showing because it

17  presumed the structures and the repair work were necessary. National Trust contends the Park

18  Service properly assessed the work necessary to preserve each structure's historic integrity

19  through its General Management Plan, which included an Environmental Impact Statement, and

20  individualized Minimum Requirements Worksheets. The Park Service suggests the MRWs alone

21  supply the requisite analysis.

22       Wilderness Watch also argues the Park Service improperly exempted its repair work from

23  review under the National Environmental Policy Act, 42 U.S.C. § 4321–70h. National Trust and

24

the Park Service respond that the work was "routine," and so fell within a categorical exclusion. The Court takes seriously the effect its decision will have on the Park Service's and other agencies' wilderness management approaches and NEPA review processes, but, as always, limits its consideration to the facts before it.

**BACKGROUND**

**A.    Wilderness Act.**

Congress enacted the Wilderness Act to ensure our "increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States." 16 U.S.C. § 1131(a). It intended "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness," defining wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain"; as an area of land "retaining its primeval character and influence, without permanent improvements or human habitation." *Id*. at § 1131(a), (c). These areas offer "outstanding opportunities for solitude or a primitive and unconfined type of recreation" and "may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value." *Id*. They are "devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." *Id*. at § 1133(b).

The Act requires agencies to administer these areas "in such manner as will leave them unimpaired for future use and enjoyment as wilderness, … so as to provide for the protection of these areas [and] the preservation of their wilderness character." *Id*. at § 1131(a). It "in no manner" lowers the applicability of another statute's standards evolved for the use and preservation of the area. *Id*. at § 1133(a)(3). Each agency retains authority to administer the wilderness area for any other purpose for which it may have been established, although it must

1  do so in a manner that preserves the area's wilderness character. *See id.* at § 1133(b). Unless

2  explicitly preserved, the Act prohibits the use of motor vehicles, motorized equipment, aircraft,

3  and any structures or installations from wilderness, "except as necessary to meet minimum

4  requirements for the administration of the area for the purpose [of securing the benefits of an

5  enduring wilderness]." *Id.* at § 1133(c).

6  **B.**   **Olympic National Park.**

7      Congress dedicated Olympic National Park in 1938. *See* Pub. L. 75-778, 52 Stat. 1241

8  (June 29, 1938). It protects 922,651 acres, which include three ecosystems: glacier-capped

9  mountains, coastline, and old-growth and temperate rain forest. It houses 29 species of native

10  freshwater fish, 70 mammalian species, 300 bird species, and over 1,100 species of native plants.

11  Included in these numbers are tens of endemic species and several threatened species, such as the

12  bull trout, the northern spotted owl, and the marbled murrelet. The Park also protects 876,669

13  acres of wilderness—one of the largest wilderness areas in the contiguous United States. *See*

14  Wash. Park Wilderness Act, Pub. L. 100-668, 102 Stat. 3961 (Nov. 16, 1988).

15      This diverse landscape includes an array of cultural and historic sites, providing a

16  glimpse at 200 years of exploration, homesteading, and community development in the Pacific

17  Northwest. The Park contains 128 historic structures, 44 of which are in wilderness. Many

18  represent the activities of the U.S. Forest Service and the National Park Service, and others

19  embody the perseverance of homesteaders and settlers and recreational development in the

20  Peninsula.

21      The five structures at the center of this case are in wilderness and are either listed on the

22  National Register of Historic Places or are eligible for listing: Botten Cabin (also known as

23  Wilder Patrol Cabin), Canyon Creek Shelter (also known as Sol Duc Falls Shelter), Wilder

24

1   Shelter, Bear Camp Shelter, and Elk Lake Shelter. Grant Humes constructed Botten Cabin,

2   which is listed, in 1928 in a remote location in the Park. The Civilian Conservation Corps

3   constructed Canyon Creek Shelter in 1939. It is the only remaining building of its kind. Wilder

4   Shelter is a "small footprint log shelter" that was constructed in 1952 in a remote location. It is

5   one of the few remaining trailside shelters in Olympic National Park. A quarter-mile away from

6   Wilder, the Park Service also constructed Bear Camp Shelter in 1952. Elk Lake Shelter was

7   constructed in 1963. It represents "the fourth variation of NPS designed shelters."

8   **C.      Preservation Maintenance Decisionmaking Process.**

9          In 2008, the Park Service completed a General Management Plan/Environmental Impact

10  Statement with a signed Record of Decision that included interim determinations about its

11  management of historic structures pending completion of a Wilderness Stewardship Plan. *See*

12  AR 2833–3365. The General Plan examined multiple strategies and set forth the Park Service's

13  selected management plan: "Where historic structures or cultural landscapes have been included

14  within designated wilderness, they will be protected and maintained using methods that are

15  consistent with preservation of wilderness character and values and cultural resource

16  requirements." AR 3322. Tiered to the General Plan, the Park Service also completed a

17  programmatic categorical exclusion. *See* AR3546. The programmatic exclusion decided routine

18  repair work on cultural structures—including basic seasonal maintenance and roof and structural

19  maintenance—was exempt from NEPA analysis from 2008 to 2011 because no "extraordinary

20  circumstances" causing significant impacts on natural resources, cultural resources, or wilderness

21  areas existed.

22         In 2011, the Park Service decided Botten Cabin, Wilder Shelter, and Bear Camp Shelter

23  needed preservation maintenance. Decay and deterioration had left Botten Cabin in poor

24

condition and needing roof repairs and new logs. *See* AR 6103. Wilder Shelter's roof had

collapsed. *See* AR6009. Only 10% of its materials were salvageable. *See id*. Many of Bear

Camp's logs had deteriorated, and because of heavy snow loads, it needed a new roof. *See* AR

6202. The Park Service issued a Minimum Requirements Worksheet for each structure to

determine if repair work was necessary, and if so, how to minimize its impacts. *See* AR6105

(Botten) ("The minimum requirement concept [is] applied as a two-step process that determines

whether the proposed management action is appropriate or necessary for administration of the

area as wilderness and does not cause a significant impact to wilderness resources and character,

in accordance with the Wilderness Act; and the techniques and types of equipment needed to

ensure that impacts on wilderness resources and character are minimized."); *see also*

AR6011(Wilder); AR6204 (Bear Camp). The Park Service determined the work was necessary

for each. After analyzing alternatives, it concluded the least impacts in time, to wilderness, and

to park resources would result if helicopters delivered supplies to Botten Cabin in five loads or

less and crews hiked in. It authorized the use of motorized tools for less than one hour per day.

The Park Service authorized the same plan for Wilder and Bear Camp, although it only permitted

three or fewer helicopter trips for each. Finally, the Park Service determined the minimum

necessary repair work for each fell within the programmatic exclusion, so it did not conduct a

NEPA review.

In March 2013, the Park Service notified the public of its intent to prepare a Wilderness

Stewardship Plan. It has received comments on draft alternatives, and after reviewing them, will

release a draft Stewardship Plan and EIS for public comment. The Court's decisions in this case

will also inform the Park Service's Stewardship Plan decisions.

In the interim, in 2015, the Park Service identified the Canyon Creek and Elk Lake Structures as needing preservation maintenance. Time and weather caused Canyon Creek's logs to naturally deteriorate and decay and its chimney flue to rust. Winter wind caused a falling snag to damage Elk Lake. For each, the Park Service used an MRW to conclude the repair work was necessary. It decided the best plan of action was to disallow motorized tools and helicopter trips. It permitted the Canyon Creek crew to use a dolly to transport materials. Finally, the Park Service issued a categorical exclusion for each structure, deciding the routine maintenance exemption excused the projects from NEPA review. *See* AR6458 (Canyon Creek); *see also* AR6742 (Elk Lake). It supplemented these documents with analyses of what impacts to environmental and historic resources would result. *See* AR6458 (Canyon Creek Environmental Screening); AR6454 (Canyon Creek Historic Properties); AR6728 (Elk Lake Environmental Screening); AR6738 (Elk Lake Historic Properties).

Wilderness Watch argues the Park Service has failed to preserve Olympic National Park's wilderness character and improperly rebuilt the five historic structures without first demonstrating their necessity, in violation of the Wilderness Act. It also argues that by relying on a categorical exclusion, and so failing to prepare an environmental assessment or impact statement taking a "hard look" at the effects of its construction, the Park Service violated the NEPA. Wilderness Watch asks the Court to conclude the Park Service acted arbitrarily and capriciously under the APA and to reverse its decisions.

Intervener National Trust suggests the crux of Wilderness Watch's arguments stem from the Park Service's 2008 General Plan, which it may not timely challenge. It also argues the Wilderness Act does not require the Park Service to perform a minimum necessity analysis before performing historical maintenance, because the Act promotes historical preservation and

1   mandates that a wilderness designation may not limit the preservation requirements of other

2   statutes, such as the National Historic Preservation Act. Even if the Park Service were so

3   required, it argues, the Park Service met its obligations by crafting its General Plan and

4   analyzing each project's necessity with an MRW. National Trust also argues the Park Service

5   appropriately concluded a categorical exclusion covered its maintenance work at each site

6   because its General Plan, supported by an EIS, considered and dismissed any extraordinary

7   circumstances.

8          The Park Service assumes a position between these two extremes. It argues the

9   Wilderness Act does not mandate the decay and eventual destruction of all historic structures in

10  wilderness, nor does the NHPA require their preservation either. Rather, these Acts work in

11  tandem, furthering the Park Service's mission to conserve scenery and the natural and historic

12  objects and wildlife therein. Specifically, the Park Service argues the Wilderness Act allows it to

13  maintain "historically used" structures, so long as its preservation work is the "minimum

14  necessary." It argues it reasonably reached this conclusion for each structure because it

15  performed individualized minimum requirements analyses, and for each project, selected the

16  least environmentally disruptive alternative. The Park Service also argues it properly determined

17  that its repair work fell within the "routine maintenance" exclusion because the work only

18  produced short term effects, and it had determined no extraordinary circumstances existed when

19  it prepared its programmatic exclusion and the Canyon Creek and the Elk Lake exclusions.

20                                  **DISCUSSION**

21  **C.    Standard of Review.**

22         The parties agree this case should be decided on summary judgment, as "there is no

23  genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of

24

1  law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106

2  S.Ct. 2505 (1986).

3       The Administrative Procedure Act governs Wilderness Watch's Wilderness Act and

4  NEPA claims. Under the APA, a court may set aside an agency's action only if it determines the

5  action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

6  law." 5 U.S.C. § 706(2)(a). It must carefully review the record to ensure the agency's action was

7  founded on a reasoned evaluation of the relevant factors. *See Friends of Yosemite Valley v.*

8  *Norton*, 348 F.3d 789, 793 (9th Cir. 2003). An agency acted arbitrarily and capriciously if it

9  relied on factors Congress did not intend for it to consider, entirely failed to consider an

10  important aspect of the problem, offered an explanation running counter to the evidence, or is so

11  implausible that it could not be ascribed to a difference in view or as the product of agency

12  expertise. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43,

13  103 S. Ct. 2856 (1983). Although a court may not substitute its judgment for an agency's, it may

14  not rubber-stamp administrative decisions inconsistent with a statute's mandate or that frustrate

15  its underlying congressional policy. *See id.*

16       An agency's decision not to prepare an EIS is typically reviewed under the arbitrary and

17  capricious standard too; however, where an agency has decided a project requires no EIS without

18  first conducting an EA, courts review the action under the reasonableness standard. *See High*

19  *Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004). Courts defer to the agency's

20  decision if it is "fully informed and well considered." *See id.* (quoting *Save the Yaak Comm. v.*

21  *Bloc*k, 840 F.2d 714, 717 (9th Cir. 1988). When an agency has taken action without observance

22  of the procedure required by law, the Court must set it aside. *See id.* (quoting *Idaho Sporting*

23  *Congress, Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000).

24

**D.      Historical Preservation as a Purpose of the Wilderness Act.**

The Wilderness Act prohibits structures in Olympic National Park's wilderness unless they are the minimum necessary for administering the area in accordance with the Act's purpose. *See* 16 U.S.C. § 1133(c). The Court must determine if historical preservation is unambiguously contrary to the Act—if it contradicts the Act's mandate to preserve wilderness or frustrates its underlying congressional policy.

Wilderness Watch argues loftily that the Park Service's decision to preserve historical structures violates the Wilderness Act because the Act only permits structures in wilderness if they further the Act's singular purpose: wilderness preservation. It argues that as a "public purpose" of wilderness, "historical use" is subservient to the Act's overarching ambition of preserving wilderness as wilderness. It also argues "historical use" refers to valuing past natural uses of the land, not manmade buildings.

National Trust argues the Ninth Circuit already rejected this argument in *Wilderness Watch v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1032–40 (9th Cir. 2010) ("*Kofa Wilderness*"), which held another public purpose—"conservation"—to be a valid goal of the Act. It argues the Wilderness Act promotes historic preservation and mandates that a wilderness designation may not discharge the preservation requirements of other statutes, such as the Historic Sites Act, the Antiquities Act of 1906, the National Park Service Organic Act, and the NHPA. It also argues the Act's legislative history demonstrates Congress never intended it to be a tool against historic preservation.

The Park Service argues that although historic preservation is subject to the Wilderness Act, it is indeed a purpose of the Act. It argues that because the Act charges it with preserving Olympic National Park's wilderness character, which includes a devotion to its "historical use,"

1   and with complying with cultural resource preservation statutes, it can maintain historic

2   structures in wilderness, so long as the means used are "necessary to meet the minimum

3   requirements for administration of the Olympic Wilderness for the purpose of the Wilderness

4   Act." *See* Dkt. #49 at 6. The Park Service suggests congressional intent and its own guidance

5   documents support its interpretation.

6        Wilderness Watch responds that resorting to the Act's legislative history and intent is

7   inappropriate because the statutory language is unambiguous, but even if the Court concludes the

8   statutory language is ambiguous and accepts the Park Service's interpretation, the Park Service

9   had an obligation to demonstrate how the structures meet the Act's purpose, which it failed to do.

10       The Ninth Circuit has not had occasion to address whether Section 1133(b)'s reference to

11  "historical use" makes preservation of historic structures a valid, or at least ambiguous, purpose

12  of the Wilderness Act, but the Eleventh Circuit has. It concluded the Act unambiguously

13  prohibited the Park Service from transporting visitors across wilderness to historic areas,

14  reasoning "the need to preserve historical structures may not be inferred from the Wilderness Act

15  nor grafted onto its general purpose." *See Wilderness Watch v. Mainella*, 375 F.3d 1085, 1092

16  (11th Cir. 2004) ("*Cumberland Island*"); *see also Olympic Park Associates v. Mainella*, No.

17  C04-5732FDB, 2005 WL 1871114, at *6 (W.D. Wash. Aug. 1, 2005) ("*Olympic Park*")

18  (concluding the Park Service acted arbitrarily and capriciously under *Cumberland Island* by

19  replacing two historic structures with new structures flown into the Olympic National Park

20  Wilderness). The Ninth Circuit has, however, addressed a related question: whether

21  "conservation" is an unambiguous purpose of the Act under Section 1133(b).

22       The Eleventh Circuit considered whether transporting tourists across wilderness to two

23  historic areas in Cumberland Island was necessary for meeting the minimum requirements for

24

1   administering the area under the Wilderness Act. *See Cumberland Island*, 375 F.3d at 1088–94.

2   Cumberland Island features some of the last-remaining undeveloped land on the Atlantic Coast's

3   barrier islands. *See id*. at 1088. Congress designated some of it as wilderness or potential

4   wilderness. *See id.* The Island hosts two historical areas listed in the National Register of

5   Historic Places: Plum Orchard, just outside the wilderness boundary, and the Settlement, located

6   in potential wilderness. *See id.* The Park Service used a one-lane dirt road to access these areas,

7   claiming it needed to do so to meet its obligations to restore, maintain, preserve, and curate

8   historic resources. *See id.* at 1089. It allowed tourists to "piggyback" onto these trips. *See id.* It

9   eventually acquired a fifteen-person van and offered transportation across the Island to these

10  sites at regular intervals (three times per week and once per month, respectively). *See id.* at 1090.

11          Wilderness Watch argued the Wilderness Act prohibited the Park Service from offering

12  these piggyback-tours because they were not the minimum necessary for the agency to meet its

13  administrative needs or for any other purpose. *See id.* The Park Service argued the preservation

14  of historic structures was in fact administration to further the purposes of the Wilderness Act,

15  referencing the NHPA and Section 1133(b)'s mention of "historical use" as a public purpose of

16  the Act for support. *See id.*

17          The Eleventh Circuit disagreed with the Park Service, concluding preservation of

18  historical structures does not further the goals of the Wilderness Act. *See id.* at 1091, 1094. It

19  pointed out that the Park Service must carry out any historic-preservation obligation deriving

20  from the NHPA in such a way as to preserve the Island's wilderness character. *See id*. at 1021

21  (citing 16 U.S.C. § 1133(b)). It reasoned Section 1133(b)'s list (devoting wilderness areas to the

22  public purposes of recreational, scenic, scientific, educational, conservation, and historical use)

23  tracks the definition of wilderness areas in Section 1131(c) (describing wilderness as an area for

24

1   recreation and with ecological, geological, scientific, educational, scenic, or historical value), so,

2   given the Act's prohibition on structures, "the only reasonable reading of 'historical use' …

3   refers to natural, rather than man-made features." *Id*. at 1092. It concluded Congress

4   "unambiguously prohibited the Park Service from offering motorized transportation to park

5   visitors through the wilderness area." *See id*. at 1094. Therefore, transporting visitors across

6   wilderness could not be "necessary" for administering the area for the purpose of the Wilderness

7   Act. *See id*. at 1092.

8        This Court adopted the Eleventh Circuit's reasoning in *Olympic Park*—a case nearly

9   identical to the one before the Court. *See* 2005 WL 1871114, at *6. Two shelters eligible for

10  listing on the National Historic Register collapsed under heavy snow loads. *See id.* at *2. The

11  Park Service reconstructed them in a maintenance yard and flew them back into Olympic

12  National Park, bringing the values of historic preservation and wilderness preservation into

13  conflict. *See id*. The Court reasoned that the designation of the Park as wilderness placed on the

14  land an overarching value of preserving its primeval character devoid of permanent

15  improvements or human habitation. *See id.* at *6. It concluded the Park Service erred by failing

16  to properly consider this value—to properly consider the Act's "mandate to preserve the wild

17  and primitive character of the Olympic Wilderness." *See id.* at *6, 8 ("The [two] shelters have

18  collapsed under the natural effects of weather and time, and to reconstruct [them] by means of a

19  helicopter is in direct contradiction of the mandate to preserve" the Park's wilderness character.).

20       Six years later, the Ninth Circuit considered a similar question: whether constructing two

21  structures to conserve bighorn sheep qualified as the minimum necessary for the administration

22  of the Kofa Refuge and Wilderness. *See Kofa Wilderness*, 629 F.3d at 1032–40. The Kofa

23  Wilderness is in the Sonoran Desert in southwest Arizona. *See id*. at 1026. A principal reason for

24

1   its establishment was preservation of bighorn sheep. *See id*. Approximately 82% of it is

2   wilderness. *See id*. The United States Fish and Wildlife Service must comply with both the

3   Wilderness Act and the Refuge Act. *See id*. at 1027.

4         Since the 1950s, the State of Arizona, non-profit organizations, and the federal

5   government developed water sources, such as catchments, wells, and tanks, to augment the

6   availability of water for the sheep. *See id*. Over 100 water sources exist. *See id*. When the

7   sheep's population declined, Fish & Wildlife investigated. *See id*. at 1029. It used mechanized

8   means to construct two PVC-pipe water structures designed to catch rainwater and to run it into

9   concrete weirs or troughs. *See id*. at 1032. Wilderness Watch argued the structures violated the

10  Act's prohibition on structures. *See id*. at 1032. Fish & Wildlife argued "conservation" was a

11  valid purpose of the Act under Section 1133(b). *See id*. at 1032–34.

12        The Ninth Circuit began as the Eleventh Circuit did: by deciding whether "conservation"

13  of bighorn sheep is unambiguously a purpose of the Act. *See id*. at 1032. The Court reasoned the

14  Act includes strongly worded phrases suggesting wilderness areas are to remain untouched, like

15  a museum diorama. But, it also states that the wilderness is to be preserved as wilderness devoted

16  to the public purposes of recreational, scenic, scientific, educational, conservation, and historical

17  use—uses "incompatible with a museum notion of wilderness." *See id*. The Ninth Circuit

18  concluded "the Act gives conflicting policy directives" to Fish & Wildlife, which "must preserve

19  the wilderness character of the area while at the same time providing for 'recreational, scenic,

20  scientific, educational, conservation, and historical use. *See id*. at 1033. It therefore held that "the

21  purpose of the Wilderness Act with regard to conservation is ambiguous." *See id*. at 1033 (citing

22  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 647–48 (9th Cir. 2004) ("Although we

23  believe that Congress intended to enshire the long-term preservation of wilderness areas as the

24

1  ultimate goal of the Act, the diverse, and sometimes conflicting list of responsibilities imposed

2  on administering agencies renders Congress's intent arguably ambiguous.")). It ultimately

3  deferred to Fish & Wildlife's interpretation that conservation of bighorn sheep follows the

4  purposes of the Wilderness Act. *See id.* at 1036 (applying *Skidmore* deference).

5       This Court considered how the conflicting holdings in *Cumberland Island* (and *Olympic*

6  *Park*) and *Kofa Wilderness* should influence its analysis of whether the Forest Service violated

7  the Wilderness Act and the NEPA by extensively rebuilding a fire lookout in the Glacier Peak

8  Wilderness Area in *Wilderness Watch v. Iwamoto*, 853 F.Supp.2d 1063, 1070–74 (W.D. Wash.

9  2012) ("*Glacier Peak*"). The lookout was a frequent destination for day-hikers that the Forest

10  Service planned to staff. *See id.* at 1065, 1068. To avoid losing it after a winter of heavy

11  snowfall, the Forest Service disassembled it, removed it from Green Mountain by helicopter,

12  salvaged original materials where possible, and repaired it. *See id.* at 1067–68. Years and 67-

13  helicopter turns later, the Forest Service reassembled the lookout in Glacier Peak on a newly-laid

14  foundation. *See id.* at 1068. The lookout did not meet the criteria for historic listing under the

15  NHPA, yet the Forest Service argued the steps it took to preserve the lookout were appropriate

16  given the Wilderness Act's devotion to historical uses of wilderness areas. *See id.* at 1069.

17       The Court decided that although *Cumberland Island* and *Olympic Park* were directly on

18  point, the Ninth Circuit's intervening analysis of the tension between the Act's conflicting policy

19  directives was instructive, and so should be followed. *See id.* at 1072–74. It reasoned that to the

20  extent Section 1133(b)'s reference to "conservation" creates an instruction that conflicts with an

21  agency's obligation to preserve wilderness character, Section 1133(b)'s reference to "historical

22  use" would logically create the same conflict. *See id.* at 1074. "Indeed, one might imagine that

23  agency action furthering the goals of conservation would be less likely to conflict with the

24

1   overriding goal of wilderness preservation than action furthering other referenced uses." *Id*.

2   Therefore, the Court deferred to the Forest Service's interpretation that historical use is a valid

3   goal of the Act. *See id*.

4        The Court agrees with the *Glacier Peak* Court. The tension the Ninth Circuit observed

5   between the Act's conflicting policy directives in Sections 1131 and 1133 creates an ambiguity

6   warranting deference to the Park Service's interpretation. While the Act's overarching ambition

7   is the preservation of "land retaining its primeval character and influence," it does not require an

8   agency to forfeit its other management values. *See* 16 U.S.C. §§ 1131(c), 1133(b). It simply must

9   administer those values in a way that preserves an area's wilderness character, such as by leaving

10   it unimpaired and by ensuring it is devoted to recreational, scenic, scientific, educational,

11   conservation, and historical use. *See* 16 U.S.C. §§ 1131(c), 1133(b). The Eleventh Circuit's

12   understanding of "historical use" as referring to former uses of the land, rather than preservation

13   of man's presence, is compelling when considering the Act as a whole. *See Cumberland Island*,

14   375 F.3d at 1092. But, as the Ninth Circuit reminds us, "Congress did not mandate that the

15   Service preserve the wilderness in a museum diorama." *Kofa Wilderness*, 629 F.3d at 1033. It's

16   guidance leads the Court to conclude that the phrase "historical use" is ambiguous; the Park

17   Service's understanding of historical preservation as furthering a goal of the Wilderness Act is a

18   plausible-enough interpretation of "historical use" that it can be ascribed to a difference in view

19   or the product of agency expertise.

20        The Court applies *Skidmore* deference to the Park Service's interpretation of the phrase.

21   *See Kofa* at 1035. Under this standard, the deference accorded depends "upon the thoroughness

22   evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier

23   and later pronouncements, and all those factors that give it power to persuade, if lacking power

24

1    to control." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S. Ct. 2164

2    (2001)).

3         The Park Service has a longstanding approach of preserving historic structures, subject to

4    wilderness concerns. Even before Congress designated the Olympic Wilderness, the Park Service

5    exercised its discretion under the Organic Act in removing structures that compromised the

6    Park's wilderness character and preserving others. *See* AR1992 (explaining that the Park Service

7    needed to remove some structures to uphold wilderness ideals and to halt ecological devastation).

8    It used the minimum tools necessary to perform this work. *See* AR489-92 (1976/80 Backcountry

9    Management Plan). And despite pushback from environmentalists, allowed backcountry

10   structures to remain extant. *See* AR1993. In its 2008 General Plan, the Park Service evaluated its

11   management approach under the Wilderness Act. It reiterated a version of its earlier approach,

12   declaring it would protect and maintain historic structures "using methods that are consistent

13   with preservation of wilderness character and values." AR 3322. The Park Service's

14   consideration of how to best manage manmade structures and wilderness in Olympic National

15   Park, both before and after the Wilderness Act, has been thorough and consistent. Therefore, the

16   Court defers to the Park Service's conclusion that historic preservation furthers a goal of the

17   Wilderness Act, and the Park Service's actions here were appropriate if they were the minimum

18   necessary. *See* 16 U.S.C. § 1133(c).

19   **D.    The Wilderness Act's Exception for Structures that are the Minimum Necessary for Preserving Olympic National Park's Historical Use.**

20

21        Wilderness Watch argues the Park Service violated the Wilderness Act by failing to

22   demonstrate that reconstruction of each of the five structures "was necessary, and the minimum

23   necessary, for administration of the Wilderness in light of all of the other structures in the

24   Wilderness, in light of the five structures at issue in this case, and in light of each structure's

1   individual and cumulative impact on wilderness character." Dkt. #21 at 28. It argues that without

2   this analysis—that by presuming the structures and work done to preserve them were necessary

3   individually and cumulatively—the Park Service's decision to rebuild was arbitrary and

4   capricious, in violation of the APA. It argues neither the Park Service's General Plan nor its

5   MRWs include a reasoned finding of necessity. Rather, the MRWs focus on the structure's

6   historical significance, refer back to the Park Service's broad cultural resource management

7   policies, and then presume the structures are necessary.

8        National Trust argues the Act does not require the Park Service to conduct a minimum

9   necessity analysis when considering whether to reconstruct historic structures. It asserts such a

10  requirement would force the Park Service to hinge its determination of whether to preserve a

11  historic building on the structure's location, rendering Section 1133(a)(3)'s mandate that a

12  wilderness designation cannot lower preservation standards meaningless. But, if the Act requires

13  such an analysis, the Park Service met this obligation through its General Plan and individualized

14  MRWs.

15       The Park Service argues that the relevant inquiry is whether it made an adequately

16  reasoned determination that the maintenance of these five structures was necessary to preserve

17  historical uses of the Olympic Wilderness. *See* Dkt. #49 at 12. For each structure, the Park

18  Service argues it properly determined maintenance work was "appropriate and necessary for

19  administration of the area as wilderness," because it exercised its Organic Act and NHPA

20  authority to determine preservation maintenance was required, performed a minimum

21  requirements analysis, and selected the least harmful alternative. It suggests the MRWs supplied

22  the proper analysis because in them it (1) addressed why the repairs sought were "necessary or

23  appropriate to meet wilderness management objectives or the requirements of other laws,

24

1  policies[,] and directives," and (2) it considered and dismissed educational and no action

2  alternatives.

3       Because the Court owes deference to the Park Service's interpretation of historic

4  structures as a benefit offered by an enduring wilderness, the operative question is whether the

5  Park Service made an adequately reasoned determination of necessity. *See Kofa*, 629 F.3d at

6  1036 (citing *High Sierra*, 390 F.3d at 646–47). "A generic finding of necessity does not suffice."

7  *See id.* at 1037 (citing *High Sierra*, 390 F.3d at 647). The Park Service must engage in a two-part

8  analysis, (1) determining whether the structures are necessary to preserve historic values, (2) and

9  if so, what work to rehabilitate them, including the use of motorized equipment and

10  transportation, is the minimum needed. *See Kofa Wilderness*, 629 F.3d at 1037; *see also*

11  *Olympic*, 853 F.Supp.2d at 1075. The "Act does not specify any particular form or content for

12  such an assessment." *Kofa Wilderness*, 629 F.3d at 1036 (quoting *High Sierra Hikers Ass'n v.*

13  *Blackwell*, 390 F.3d 630, 647 (9th Cir. 2004)). Courts defer to the form selected by the agency.

14  *See id.*

15       **A.     Necessity.**

16       At the least, the agency must first explain why its chosen action is necessary when

17  compared to other courses of action not prohibited by the Act. *Kofa*, 629 F.3d at 1039. In *Kofa*

18  *Wilderness*, Fish & Wildlife failed to make an initial finding that the rain structures were

19  necessary for the conservation of bighorn sheep. *See* 629 F.3d at 1037 ("The Service

20  undoubtedly found that, *assuming that improvements to water facilities were necessary*, the

21  development of the two water structures was necessary…. But the key question—whether water

22  structures were necessary at all—remains entirely unanswered and unexplained by the record.")

23  (emphasis in original). Without first eliminating other strategies that could have helped to

24

conserve the sheep (temporarily closing trails and reducing mountain lion predation, translocations, and hunting), Fish & Wildlife presumed improvements to water facilities were necessary and reasoned from that faulty position. *See id.* The Court explained, "It is beyond dispute that, if addressing other variables will lead to satisfactory sheep recovery, then a new structure is not 'necessary.'" *Id.* at 1039. The Service's failure to "provide enough evidence and explanation in the record to assure [the Court] that it fully considered those avenues and nevertheless rationally concluded that new water structures are, in fact, necessary," was fatal to its conclusion. *Id.* at 1039–40. The agency should also consider whether repairs are necessary. *See Glacier Peak*, 853 F.Supp.2d at 1075 ("The essential question … is whether the … decision to engage in extensive rehabilitation and reconstruction …and the related use of mechanized transport [i]s 'necessary' for the 'minimum administration' of the area for historical use.").

The Court is loath to engage in a "magic words review," where the propriety of the Park Service's analysis hinges on whether it included the correct words in its MRWs, rather than whether its analysis carried the substantive weight arbitrary and capricious review demands. Indeed, the record as a whole—what the Court is charged with reviewing—demonstrates the agency made a reasoned finding of necessity by determining both that the structures are necessary to preserve historic values in Olympic National Park and that it was necessary to repair each one.

In its General Plan/EIS, the Park Service decided to "protect and maintain" historic structures in wilderness, even though doing so could produce minor adverse impacts on wilderness character. *See* AR2784–87; *see also* AR3322. It reached this conclusion after thoroughly evaluating and comparing four management approaches and considering over 500 comments, including a submission by the Wilderness Watch. *See* AR3238; *see also* AR 3321. By

1   deciding it best to protect and maintain historic structures in wilderness, the Park Service

2   inherently found them necessary to preserve Olympic National Park's history.

3         It considered to what degree each structure needed to be repaired in part one of its

4   MRWs. In the MRW for each structure, the Park Service decided reconstruction was necessary

5   to preserve the structure's longevity, to prevent it from deteriorating over time. *See, e.g.*,

6   AR6016 (Wilder); AR6110 (Botten); AR6209 (Bear Camp); AR6467 (Canyon Creek); AR6715

7   (Elk Lake). In the main, this analysis involved three steps. The agency first considered whether

8   reconstruction was necessary given wilderness management objectives or Park Service policy. It

9   reasoned repair was necessary under its management policies, because the structure-to-be-

10  repaired either was listed on the National Register of Historic Places or was eligible for listing.

11  *See id.* (referencing Park Service Management Policies, which direct cultural resources "included

12  within wilderness … to be protected and maintained"). The agency then considered and

13  dismissed a non-prohibited alternative: educating visitors about each structure's history. Third,

14  the Park Service considered whether the work could occur outside of wilderness. For all five

15  structures, the Park Service decided it could not because the structures are in wilderness and

16  educating visitors was an insufficient alternative. *See* AR6017 (Wilder); AR6111 (Botten);

17  AR6210 (Bear Camp); AR6468 (Canyon Creek); AR6716 (Elk Lake).

18        Together, the Park Service's General Plan and five MRWs demonstrate it reasonably

19  concluded each structure was necessary to preserve historical values, and so warranted repair.

20  The Park Service therefore made an adequately reasoned determination of necessity for each.

21        **B.    Minimum Tools Required.**

22        The Park Service answered the second minimum necessity question—what are the

23  minimum tools, techniques, and actions needed to repair each structure—in part two of its

24

1    MRWs. Wilderness Watch argues the Park Service arbitrarily rejected "no action" alternatives

2    that could have maintained the structures' cultural integrity without disturbing the Park's

3    wilderness character. It also argues the Park Service failed to justify its use of motorized tools

4    and helicopters to repair Botten Cabin, Wilder, and Bear Camp Shelter, considering it

5    acknowledged the availability of less intrusive means. The Park Service supports its decision to

6    use motorized tools and helicopters by arguing that for each structure, it chose the alternative that

7    would create the least impacts in time and duration, on wilderness, and to park resources.

8         When an agency evaluates its available alternatives, it must address why its repair plan

9    includes no more work than necessary. *See Olympic*, 853 F.Supp.2d at 1076. In general,

10   "machinery as intrusive as a helicopter is rarely necessary to meet minimum requirements for the

11   administration of [an] area [because] helicopters carry man and his works[,] and so are

12   antithetical to a wilderness experience." *Olympic*, 853 F.Supp.2d at 1076 (internal punctuation

13   omitted).

14        The Park Service always considered at least three alternatives, including a "no action"

15   alternative and usually including a non-motorized alternative, though it did not consider an

16   alternative without motorized tools and without a helicopter for Bear Camp. *See* AR6212–13. It

17   assessed each alternative's positive and negative effects on the surrounding area's wilderness

18   character. When justifying its selection, it set forth the chosen alternative's advantages and ways

19   to mitigate its environmental impacts. *See* AR6025 (Wilder); AR6119 (Botten); AR6219 (Bear

20   Camp); AR6478 (Canyon Creek); AR6725 (Elk Lake).

21        Although the Court might disagree with the Park Service's ultimate conclusions, such as

22   its decision to repair Bear Camp before assessing the viability of an alternative without

23   motorized tools and without a helicopter, it cannot say that the agency arbitrarily and

24

1  capriciously determined what tools and techniques constituted the minimum necessary. The Park

2  Service considered the positive and negative effects of multiple alternatives and selected the

3  option that in its expert opinion would affect wilderness the least. It relied only on factors that

4  Congress intended for it to consider, and it evaluated all important aspects of the problem. The

5  Park Service therefore reasonably determined the minimum tools and techniques needed.

6  **E.       The Park Service's Adoption of its Routine Maintenance Categorical Exclusion.**

7         Next, Wilderness Watch argues the Park Service wrongly applied the routine

8  maintenance categorical exclusion because its actions had, and have, the potential to significantly

9  affect the environment. It argues that to be excludable, an action must easily fit within the

10 exclusion and clearly have no potential for environmental impact. It also argues numerous

11 "extraordinary circumstances" exist, precluding the Park Service from using this exclusion.

12        National Trust suggests adopting Wilderness Watch's position would require the Park

13 Service to complete a full NEPA review of its cultural resource policy before performing any

14 maintenance work. It argues the Park Service appropriately used a categorical exclusion because

15 the agency considered any extraordinary circumstances in its General Plan/EIS.

16        The Park Service contends it correctly applied the routine maintenance exclusion. It

17 argues its repair work properly fell within this exclusion because its limitation to "short term

18 effects" regards the maintenance-work's effects, not the effects of the structure's resultant

19 durability. At least, the Park Service argues, the Court must defer to the agency's interpretation

20 of its own regulation, as 43 C.F.R. § 46.210(f) is neither plainly erroneous nor internally

21 inconsistent. The Park Service also argues the environmental screenings for its 2008

22 programmatic exclusion and its Canyon Creek and Elk Lake categorical exclusions demonstrate

23 no extraordinary circumstances existed.

24

1    NEPA is a procedural statute that ensures federal agencies take a hard look at the

2    environmental consequences of their actions. *See High Sierra*, 390 F.3d at 639. In general, it

3    requires an agency to prepare an environmental assessment or an environmental impact

4    statement before committing its resources to a project, unless a categorical exclusion applies. *See*

5    *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir. 2002). An agency may adopt a categorical

6    exclusion for a category of actions that "do not individually or cumulatively have a significant

7    effect on the human environment." 40 C.F.R. § 1508.4 (2016). The Park Service's exclusions

8    include one for "routine … maintenance, renovations, and replacement activities having limited

9    context and intensity (e.g., limited size and magnitude or short-term effects)." 43 C.F.R.

10   § 46.210(f). Although, it may not apply this exclusion if "extraordinary circumstances," such as

11   production of significant impacts on natural resources, cultural resources, or wilderness areas,

12   would exist. *See* 43 C.F.R. § 46.215.

13       To assess whether an agency properly applied an exclusion, the reviewing court examines

14   the documentation that the agency made contemporaneously with its adoption of the exclusion.

15   *See Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5 (9th Cir. 1996); *see also*

16   *California*, 311 F.3d at 1176. The record should "show that the agency considered the

17   environmental consequences of its action and decided to apply a categorical exclusion to the

18   facts of a particular decision. Post-hoc invocation of a categorical exclusion does not provide

19   assurance that the agency considered the effects of its action before deciding to pursue it. *Id*. A

20   brief statement that a categorical exclusion is being invoked will typically suffice, although

21   concern for adequate justification is heightened when "there is substantial evidence in the record

22   that exceptions to the categorical exclusion are applicable." *Id*. When such evidence exists, "the

23   agency must at the very least explain why the action does not fall within one of the exceptions."

24

*Id.* at 1177; *see also* 49 Fed. Reg. at 21439 (If an exception to the exclusion might exist, the agency must prepare environmental documents).

The Park Service concluded in its 2008 programmatic exclusion that routine maintenance on Olympic National Park's historic structures between 2008 and 2011 was exempt from NEPA review. *See* AR3553–67 (programmatic CE). It defined this work as including "the preparation of logs, timbers, shakes, and other materials, and the replacement of roofs and structural members." AR 3549. It properly considered the work's environmental impacts, confirming its effects would be limited in duration, context, and intensity. *See* AR3554 (environmental screening). The Park Service applied this exclusion to its 2011 work on Botten Cabin, Wilder Shelter, and Bear Camp Shelter. Its work on these structures—repairing their roofs and replacing logs—falls within the routine maintenance exclusion. *See, e.g.,* AR6046, 56 (Botten Cabin photos showing deteriorating logs); AR5990 (Wilder Shelter photo showing collapsed roof); AR6145 (Bear Camp Shelter photo of deteriorating logs and damaged roof). The Park Service therefore reasonably exempted this routine, replacement work from an EIS or EA.

The Park Service conducted project-specific categorical exclusions for the Canyon Creek and Elk Lake structures. *See* AR6458 (Canyon Creek CE); *see also* AR6742 (Elk Lake CE). It assessed the environmental impacts of its anticipated repair work. *See* AR6436 (Canyon Creek environmental screening); *see also* AR6728 (Elk Lake environmental screening). The Park Service's replacement of Canyon Creek's deteriorated logs, rafter tails, and post ends and chimney flue falls within the routine maintenance exception, as does its rehabilitation of Elk Lake's roof. *See* AR6343 (Canyon Creek photo showing replaced logs); *see also* AR6697 (Elk Lake photo showing damaged roof). The Park Service therefore reasonably exempted this work from a full-fledged environmental assessment.

1
## CONCLUSION

2        The record demonstrates that the Park Service did not arbitrarily and capriciously repair

3 Botten Cabin, Canyon Creek Shelter, Wilder Shelter, Bear Camp Shelter, and Elk Lake Shelter

4 in Olympic National Park's wilderness. It reasonably determined the minimum amount of work

5 necessary to preserve the structure's historic integrity, consistent with the Wilderness Act. It also

6 properly exempted this routine, replacement work from environmental review by first

7 considering and dismissing the possibility that it would produce significant environmental

8 impacts. Therefore, Wilderness Watch's Motion for Summary Judgment [Dkt. #21] is DENIED,

9 and the Park Service's Motion for Summary Judgment [Dkt. #42] is GRANTED. The case is

10 DISMISSED.

11        IT IS SO ORDERED.

12        Dated this 14th day of December, 2016.

13

14        _____
          Ronald B. Leighton
15        United States District Judge

16

17

18

19

20

21

22

23

24